Eastern District of Kentucky
**FILED**

**JUN 09 2006**

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CIVIL ACTION NO. 05-CV-232-KSF

DULCE CUCO                                                    PLAINTIFF

VS.                    **MEMORANDUM OPINION AND ORDER**

FEDERAL MEDICAL CENTER-LEXINGTON, ET AL.              DEFENDANTS

## I.  INTRODUCTION

Plaintiff Dulce Cuco ("Cuco") filed the present action arising out of medical treatment she received while incarcerated at the Federal Medical Center-Lexington ("FMC-Lexington" or "FMC") from November 2003 to August 2004.  [Record No. 1]  Cuco sued FMC-Lexington, as well as a number of prison officials and most of her health care providers, in both their individual and official capacities (collectively, the "Defendants").  Her complaint asserted (1) civil rights claims under the Eighth Amendment to the Constitution of the United States through the Civil Rights Act of 1871, 42 U.S.C. §1983; (2) claims under the Americans with Disabilities Act, 42 U.S.C. §12132; and (3) pendent state law claims arising under Kentucky common law for negligence, gross negligence, and the intentional infliction of emotional distress.

The following are currently pending before this Court:

1.  Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment ("Defendants' Motion") [Record No. 21];

2.  Cuco's Motion for Extension of Time to file a response [Record No. 22];

3.  Cuco's Motion for Leave to Amend Complaint [Record No. 24];

1

4. Defendants' Motion for Extension of Time to file reply [Record No. 25]; and

5. Cuco's Motion to Accept Tendered Amended Complaint [Record No. 29].

Both of the motions to extend time to file responsive memoranda [Record Nos. 22, 25] will be granted, as each motion indicated that opposing counsel had no objection and the time requested was reasonable. The substantive motions are addressed below.

## II.  FACTUAL BACKGROUND

Cuco was convicted under 18 U.S.C. §1546 on October 28, 2003, of conspiracy to make a false alien employment application. She was sentenced to a ten-month term of incarceration to be followed by a three-year term of supervised release. *United States v. Cuco*, 03-CR-297, District of New Jersey; Declaration of Joe W. Booker, Jr., Warden at FMC-Lexington, attached as Attachment 3 to Defendants' Motion ("Booker Decl.") at ¶4.

Cuco self-surrendered at FMC-Lexington on November 11, 2003. Cuco alleges that she told medical staff that she needed to see a doctor immediately, but that she was not seen by FMC's medical staff until three days later. As noted below, it appears Cuco was seen by medical staff two days later, on November 13, 2003, not three days later. Cuco's medications were also confiscated in accordance with prison policy. Cuco alleges that as a result, she vomited and had a panic attack. Cuco has identified this delay as one of the bases for her claims. Complaint at ¶24.

A review of Cuco's prison medical records, attached as Exhibit Q to Defendants' Motion (hereinafter "Cuco Medical Records"), indicates that a medical history was taken by Physician's Assistant (hereinafter "P.A.") T. Madison on the day she arrived. Cuco Medical Records at BOP0126-28.

At the time of her initial assessment on November 13, 2003, Cuco was five feet and one inch

2

tall and weighed 286 pounds, which medical staff characterized as "morbidly obese." Declaration of Michael Growse, M.D., Clinical Director at FMC, attached as Exhibit 2 to Defendants' Motion ("Growse Decl."), at ¶12. Medical records indicate that Cuco suffered from Post Traumatic Stress Disorder, manic depression, panic disorder, anxiety and depression with two remote suicide attempts, a hiatal hernia, stomach ulcers, anemia requiring intravenous iron therapy, a cyst in the right ovary, and uterine fibroids. Cuco also reported being allergic to oral iron supplements. Growse Decl. at ¶6-9; Declaration of Rebecca Durbin, former P.A. at FMC-Lexington, attached as Attachment 5 to Defendants' Motion ("Durbin Decl.") at ¶6-10; Cuco Medical Records at BOP0048-51, 0124-28, 0129-30; Declaration of Susan Wilcox, Ph.D., Psychologist at FMC-Lexington, attached as Attachment 14 to Defendants' Motion ("Wilcox Decl.") at ¶¶5-10; Psychology Services Intake Screening Summary, attached as Exhibit R to Defendants' Motion ("Psychology Screening Form") at BOP0129-30.[1]

Cuco alleges that during her November 13, 2003 meeting with psychologist Wilcox, she asked to see a psychiatrist so that she could continue to receive her medications. These included, at least, Buspar, used to treat anxiety and panic disorder, and Xanax, used to treat depression. Cuco alleges that she was never seen by a psychiatrist, and that this omission constitutes another basis for the claims in her Complaint.

Cuco alleges that shortly after arriving at FMC she was given a test for tuberculosis which came back positive. She further alleges that shortly after she was put on medication for it, she began to suffer severe pain near her liver. Cuco finally alleges that Dr. Growse later took her off the

---

[1] The descriptions or characterizations of medical terms, diagnoses, or treatments are derived from the parties' memoranda, the attachments and affidavits thereto, the Cuco Medical Records, and, where necessary, from THE MERCK MANUAL OF DIAGNOSIS AND THERAPY (18th ed. 2006).

medication, stating that it was potentially dangerous for her in light of her anemic condition, and that he had "no idea" why she had been given the medication in the first place. Cuco also indicates that this is a basis for a damage claim in this proceeding.

Cuco alleges that on November 25, 2003, she complained of heavy menstrual bleeding during a gynecological examination and informed medical staff that her anemia responded poorly to oral iron supplements, but she was given no alternative therapeutic option. Defendants allege that during this visit Cuco refused her initial pelvic exam. Growse Decl. at ¶14; Durbin Decl. at ¶14; Cuco Medical Records at BOP0044, 0080. The Report of Medical Examination includes a note in Durbin's handwriting indicating that Cuco refused her pelvic examination: "Pelvic: *Pt. refused see SF* [GSA Standard Form]-*368.*" Cuco Medical Records at BOP0080, BOP0124-25. In her Response, Cuco alleges that she did not decline her pelvic examination; rather, Durbin performed the pelvic exam but advised her against having a pap smear because she had one performed only a month before. The documentary evidence offers some support for this characterization of the events. An Initial Gynecological Survey dated December 1, 2003, indicates that Cuco reported "*Last pap smear - 10/18/03.*" Cuco Medical Records at BOP0120. On December 12, 2003, Durbin completed a Physical Examination form, largely left blank other than the explanation, "*Pt declines. BP 358 signed 11/25/2003. F/U* [follow-up] *home 10/2004 for Pap. Pt understands above.*" Cuco Medical Records at BOP0121.

Cuco alleges that at some point in December 2003 she was seen by an outside gynecologist who happened to be at FMC, and that this physician indicated that she needed surgery for palpable fibroids. Cuco's medical records indicate that she was seen on December 18, 2003, by W. Hagan, M.D., but the visit appeared to concern her anemia and gastric upset; there is no mention of her

4

fibroids. Cuco Medical Records at BOP0041-42. Cuco's voluminous medical records include numerous documents that evidence a number of visits by outside physicians, but there do not appear to be any documents in the record which identify a visit of the kind described by Cuco.

While at FMC-Lexington, Cuco's blood was routinely drawn and tested to monitor her anemia, hormone levels, and other blood chemistry. Blood tests were performed on December 2, 2003; January 23, 2004; March 1, 2004; and April 19, 2004, and the results were "essentially normal." Growse Decl. at ¶15-17. Cuco Medical Records at BOP0030, 0046, 0052-78.

A sick call note dated December 5, 2003, indicates that Cuco advised Durbin that she had previously been on intravenous iron because the oral iron upset her stomach. Cuco Medical Records at BOP0046.

Cuco alleges that at some point in December 2003 she complained of breast pain and discharge to Durbin, and that she now is concerned that she might have breast cancer. In an entry dated December 15, 2003, Durbin noted Cuco's complaint of a rash under her breast, and noted a two-by-three centimeter area of skin irritation under Cuco's left breast. Cuco Medical Records at BOP0043.

On December 23, 2003, Cuco was examined by Philip LaFleur, P.A., who noted her various medical concerns and placed her on "medical idle" pending a follow-up appointment on December 30, 2003. Declaration of Philip LaFleur, P.A., at FMC-Lexington, attached as Attachment 12 to Defendants' Motion ("LaFleur Decl.") at ¶23; Cuco Medical Records at BOP0041.

A sick call note dated January 5, 2004, indicates that Cuco complained to Durbin that she wanted injectable iron because the oral iron supplements were upsetting her stomach. Cuco expressed concern and severe grief because her brother had been placed on life support after his

5

lungs collapsed, his brain began to bleed, and he entered a coma.  Cuco Medical Records at BOP0039.

On January 15, 2004, Cuco sent an Inmate Request to Staff form to Associate Warden Belinda Snead requesting that she be seen by a hematologist and given a pelvic ultrasound and mammogram.  Declaration of Belinda Snead, Associate Warden at FMC-Lexington, attached as Attachment 8 to Defendants' Motion ("Snead Decl.") at ¶¶14-18; Inmate Request to Staff, attached as Exhibit L to Defendants' Motion.

On January 16, 2004, Paulette Shirley, then an R.N. at FMC-Lexington, met with Cuco, who expressed grief of an unknown etiology and great discomfort due to reflux.  Declaration of Paulette Shirley, former R.N. at FMC-Lexington, attached as Attachment 6 to Defendants' Motion ("Shirley Decl.") at ¶24; Cuco Medical Records at BOP0038.

Cuco alleges that at some point in January 2004 she met with Rosie Harless, the Executive Assistant and director of the women's camp at FMC, and further alleges that Harless told Cuco that she would get her help, but never did so.  For her part, Harless denies any participation in decisions regarding Cuco's medical treatment.  Declaration of Rosie Harless, Executive Assistant at FMC-Lexington, attached as Attachment 10 to Defendants' Motion ("Harless Decl.") at ¶¶6-11.

On January 29, 2004, Cuco was examined by a gynecologist from the University of Kentucky Medical Center ("UKMC").  He diagnosed Cuco as anemic with dysmenorrhea (painful menstruation without an evident cause) and requested a vaginal ultrasound.  He also recommended oral progesterone (birth control pills) daily for the last ten days of each month.  He also noted Cuco's complaint of discharge from her left breast and indicated that Durbin would examine her and perhaps do a smear of the discharge.  Growse Decl. at 14; Cuco Medical Records at BOP0035, 0116; Durbin

6

Decl. at ¶15. Cuco alleges that the gynecologist recommended oral progesterone, but only after Durbin stated that Lupron (leuprolide, an injectable hormone used to treat uterine fibroids) could not be administered at FMC-Lexington because prison regulations prohibited the use of needles needed for the injection. However, there is no mention of Lupron in the examination notes. Cuco alleges that the progesterone caused her vaginal bleeding to increase to thirty (30) days a month, and that this is a known effect of the progesterone.[2]

Defendants assert that at 10:30 a.m. on February 4, 2004, Cuco was scheduled for a follow-up breast examination and pap smear related to her complaint of discharge from her breast, but that she missed her call-out appointment. Durbin Decl. at ¶16; Cuco Medical Records at BOP0034. Cuco does not deny this assertion.

On February 12, 2004, Cuco was given a mammogram at the Veterans' Administration Medical Center ("VAMC"), which was assessed by staff radiologist Primo Milan, M.D. He noted that Cuco reported being shot in the right breast in 1984. The films revealed multiple BB pellets in the right breast and a small nodule in the left breast, which he identified as "probably benign fibroadenoma or cyst." He recommended an ultrasound for further evaluation. Durbin Decl. at ¶17; Cuco Medical Records at BOP0115. Cuco alleges that she was not given a copy of these results until August 9, 2004, immediately before she was released to a halfway house.

---

[2] Cuco's allegation that the progesterone caused her vaginal bleeding to increase to thirty (30) days a month appears to contradict her own assertions in the Form BP-9 she filed on April 28, 2004. In that grievance form, she asserted that her bleeding had increased from 8-9 days to 18-19 days. See Declaration of Kevin J. Walasinski, Senior Attorney for BOP, attached as Exhibit 1 to Defendants' Motion ("Walasinski Decl.") at ¶8; Ex. C, at pg. 3. Cuco made identical allegations in a complaint filed in the District Court of New Jersey. *Cuco v. United States and Federal Bureau of Prisons*, 05-5347, District of New Jersey [Record No. 1 therein, at pg. 2]. Cuco's medical records also suggest otherwise. *See, e.g.*, Cuco Medical Records at BOP0022.

Cuco reported for sick call on February 23, 2004, and told Durbin of an episode where suddenly her tongue wouldn't work, rendering her incapable of speech, and her arm tingled or felt numb. Cuco complained of frequent hot flashes. After a thorough and apparently unremarkable evaluation, Cuco was put on rest for the day and directed to increase her fluid intake. Cuco Medical Records at BOP0031-32.

In a March 9, 2004 administrative note, Durbin indicated that Cuco advised her that she was not taking her oral iron supplements because they aggravated her ulcers. Cuco complained of blurred vision and dizziness. Cuco Medical Records at BOP0029.

Cuco alleges that while she was mentally too "foggy" to do so on her own, other prisoners saw that she was weak and ill and made sure that she took all of her oral iron supplements. Cuco further states that prior to her incarceration, her medical specialists had abandoned oral iron supplements as a treatment option for her severe anemia because they (1) were ineffective at treating her anemia; and (2) exacerbated her stomach upset. Cuco has submitted the affidavit of Joseph Ballaro, M.D., a physician in New Jersey, in support of her position. Dr. Ballaro states that he has been treating Cuco since 1993, that she is severely anemic, and that he has referred her to several specialists, including hematologists and neurologists. Dr. Ballaro further states that "Ms. Cuco's anemia is controlled through intervenus [sic] iron treatments; oral iron alone has no discernable impact on her anemia and causes her severe gastric upset." Affidavit of Joseph Ballaro, M.D., attached as Exhibit N to Cuco's Response.

Cuco alleges that Unit Manager Teri Ward saw her in the hallway on March 11, 2004, stated that Cuco "looked bad," and told her to send cop-out requests to get proper medical care. Cuco then filed four Inmate Request to Staff forms that same day, requesting that she be given (1) a pelvic

ultrasound; (2) copies of her results from prior lung x-rays, blood results, and mammogram; (3) a consultation with a hematologist; and (4) a consultation with a neurologist.  Ward subsequently responded in writing that (1) Cuco's pelvic ultrasound would be done with consultations already scheduled; (2) the test results she sought could be reviewed with FMC medical staff during her next call-out; (3) FMC medical staff would perform additional blood work and review all test results with her during the consultation already scheduled for March 24, 2004; and (4) Cuco could raise her concerns regarding numbness in her arms with FMC medical staff during her next call-out. Declaration of Teri Ward, Unit Manager at FMC-Lexington, attached as Attachment 11 to Defendants' Motion ("Ward Decl.") at ¶¶13-17; Responses, attached as Exhibits M, N, O, P to Defendants' Motion.  Cuco was examined by FMC-Lexington medical staff on March 15, 18, and 24, 2004, and by a UKMC physician on April 5, 2004. Cuco Medical Records at BOP0023-27.

On March 14, 2004, P.A. LaFleur placed Cuco on medical idle for one day.  LaFleur Decl. at ¶24; Cuco Medical Records at BOP0029.

On March 18, 2004, Plaintiff was seen again by UKMC gynecologist Angie Davison, M.D., complaining of increased vaginal bleeding because of the Provera (a form of synthetic progesterone, sometimes characterized as a progestin) and difficulty taking her iron supplements ("FeSO$_4$", which is ferrous sulfate [iron]) daily with water. To continue treating Cuco's vaginal bleeding, Dr. Davison prescribed continuing the iron supplements and the Provera, but each only "QOD" ["quater otra die," Latin for "every other day"].  Davison also requested  a vaginal ultrasound ("U/S") and blood tests ("CBC").  P.A. Durbin ordered those tests the same day.  Growse Decl. at ¶19; Cuco Medical Records at BOP0117. Cuco alleges that Dr. Davison told Durbin that Cuco was in bad condition and needed Lupron injections, but that Durbin told her that FMC doesn't give Lupron injections.  There

9

is no mention of Lupron in the examination notes.

Cuco alleges that after a March 2004 doctor's appointment, the physicians from UKMC directed that surgery on her uterine fibroids be conducted "immediately," but that the surgery was not performed until July 26, 2004. It appears that Dr. Davison was the only UKMC physician to examine Cuco in March 2004, and her examination notes make no mention of any need for immediate surgery on her uterine fibroids. Cuco Medical Records at BOP0117.

On April 5, 2004, Cuco was examined by Pam Schneider, M.D., and discussed her concerns regarding her anxiety and depression, anemia, gastro-enteriatal reflux disease, uterine fibroids, and ovarian cysts. Cuco indicated that she had difficulty tolerating the oral iron supplements because they aggravated her stomach ulcers, and the ranitadine (Zantac) was ineffective at controlling the symptoms. Dr. Schneider indicated replacing the Zantac with Aciphex and reassessing on follow-up, ordering an ultrasound for evaluation, continuing the Provera (synthetic progesterone) prescription, and continuing medications to address other medical and psychological concerns. BOP0023-25.

An April 12, 2004 call-out note indicates that Cuco complained of vomiting after taking her iron tablets. BOP0022. Cuco's medical records indicate that on April 18, 2004, and May 3, 2004, Cuco told medical staff that she had a history of allergic reactions to iron dextran given by injection. Cuco Medical Records at BOP0019, 0088.

During an April 20, 2004 examination of Cuco by Nurse Practitioner ("N.P.") Quentin Moore, he noted that Cuco complained of heart palpitation, tachycardia, fatigue, dizziness, and stomach pain due to her oral iron supplements. Moore ordered that blood tests be taken, a prescription for iron dextran complex to address her anemia, and placed her on work idle for two weeks. Declaration of Quentin Moore, N.P. at FMC-Lexington, attached as Attachment 15 to

10

Defendants' Motion ("Moore Decl.") at ¶¶24-26; Cuco Medical Records at BOP0022.

Defendant Linda de Hoyos, M.D., a physician at FMC-Lexington, states that she had no interaction whatsoever with Cuco, and the only thing she remembers is discussing with another medical staff member the possible need for a blood transfusion if Cuco's condition did not improve. Declaration of Linda de Hoyos, M.D., attached as Attachment 7 to Defendants' Motion ("de Hoyos Decl.") at ¶¶6-9. Cuco alleges that de Hoyos examined her along with Moore and discussed and approved a blood transfusion. Cuco's Response at pgs. 3-4, n.3. Defendant Moore alleges that he examined Cuco on three occasions: on April 20, 2004; June 18, 2004; and August 3, 2004. Moore Decl. at ¶23. This is consistent with Cuco's medical records. BOP0003, 0011, 0022. The examination notes from on and around these dates do not include any entries by Dr. de Hoyos, are not signed or initialed by her, and do not reflect any of her handwriting.

A pelvic ultrasound was taken of Cuco on April 23, 2004. Panchal Mahendra, M.D., interpreted the results on April 30, 2004, showing a mildly enlarged uterus with multiple fibroids but no ovarian cysts. The report concluded with an impression of "[u]terine fibroids, otherwise unremarkable exam." Growse Decl. at ¶¶ 20, 22; Durbin Decl. at ¶¶19; Cuco Medical Records at BOP0083, 0101, 0112, 0118.

On April 29, 2004, Cuco was seen by defendant Ranulfo Mendoza, P.A., during inmate sick call. Cuco requested "Depro" (a common name used for Depo Provera) injections or birth control pills to control her menstrual bleeding. Mendoza indicated that a treatment plan would be formulated upon receipt of Cuco's lab test results. Declaration of Ranulfo Mendoza, P.A. at FMC-Lexington, attached as Attachment 4 to Defendants' Motion ("Mendoza Decl.") at ¶¶25-28; Cuco Medical Records at BOP0021. Notes regarding those lab test results indicated that Cuco's

11

intramuscular injections of iron dextran would be discontinued in light of Cuco's reporting a prior allergic reaction, and ferrous gluconate would be started in lieu thereof. Cuco Medical Records at BOP0020.

Cuco alleges that at some point in Spring 2004 during a "chicken day" visit by the warden, a day when the warden listens to prisoner complaints in an open forum, Cuco told Booker of her medical problems and her concerns about improper or delayed treatment.

Growse met with Cuco on May 3, 2004, to discuss her options and advised her she may need a blood transfusion if she had continued heavy bleeding. Dr. Growse advised Cuco that because her anemia had appeared to have stabilized and was slowly improving, it would be best to avoid the risk of blood transfusions by trying to increase her oral iron intake. Growse's examination notes indicate that Cuco agreed to this course of treatment. Cuco Medical Records at BOP0019.

Cuco further alleges that during a May 3, 2004 consultation with UKMC doctors they directed that her surgery for uterine fibroids be given "priority scheduling," citing Cuco Medical Records at BOP0114. Cuco misreads the document. The May 3, 2004 date on the Consultation Sheet is the date Dr. Growse requested an OB/GYN consult. The June 24, 2004 date is the date that the UKMC physician entered his or her notes on the Consultation Sheet, noting a prior visit to a UKMC gynecologist on June 9, 2004. On June 9, 2004, Cuco was examined and scheduled for a dilation and curettage ("D&C") and hysteroscopy procedure and a trial of Depo Provera. The June 24 notes indicated that the Depo Provera had subsequently failed to improve her symptoms. *See also* Cuco Medical Records at BOP0106. The notes conclude: *"Pt. is scheduled for surgery but I don't know when (and I am not positive it has actually been scheduled or may be only recommended - the appt. has to be made from here) - Pt. appears very pale and tired today - Please schedule as soon*

12

*as possible."* The surgery was performed a month after the notes were entered, on July 26, 2004.

After Cuco hit her head in the shower on May 4, 2004, and complained of a headache, she was referred by Pam Schneider, M.D., to a contract neurologist, Joseph Berger, M.D. The neurologist diagnosed Cuco as having migraine headache(s) and peripheral neuropathy (a form of spinal nerve dysfunction characterized by pain and muscle weakness or atrophy), and he discussed treatment through diet and hygienic measures, recommended a trial of nortryptilene or amitryptilene (Elavil), and further tests for her neuropathy. The notes indicate that Cuco refused to sign the consent form for the Elavil prescription. Blood tests for numbness were normal. Growse Decl. at ¶35; Cuco Medical Records at BOP0016-18, 0107. Cuco alleges that Growse later canceled the Elavil prescription because it could be dangerous for her.

On May 11, 2004, Shirley entered an administrative note that Cuco refused to sign the consent form for Elavil, and that Cuco stated that the consulting physician did not review the consent form with her and she did not want to take the medication until she had the chance to talk again with the consulting physician about taking Elavil. Shirley Decl. at ¶24; Cuco Medical Records at BOP0017.

On May 14, 2004, Cuco met with Robert Williams, P.A. At this examination, Cuco refused to take the Elavil that had been prescribed for her on May 4, 2004. Declaration of Robert Williams, P.A. at FMC-Lexington, attached as Attachment 9 to Defendants' Motion ("Williams Decl.") at ¶¶23-24; Cuco Medical Records at BOP0016.

On May 27, 2004, P.A. Matthew Zagula logged the arrival of Cuco's blood test results. Declaration of Matthew Zagula, P.A. at FMC-Lexington, attached as Attachment 13 to Defendants' Motion ("Zagula Decl.") at ¶24; Cuco Medical Records at BOP0015.

13

Dr. Growse met with the Plaintiff on June 1, 2004, and noted that her blood count had improved. Cuco indicated that she was tolerating the oral iron tablets and that she wanted to avoid major surgery until her release from incarceration. Weekly blood count tests were ordered. Growse Decl. at ¶¶24-30; Cuco Medical Records at BOP0014-15, 0019, 0049.

A nerve conduction velocity study conducted on June 4, 2004, by David Nestor, P.T., was negative. Growse Decl. at ¶36; Cuco Medical Records at BOP0012-13, 0016-17, 0085-86. Cuco alleges that Nestor told her that he did not know how to operate the machine and that it was dusty. Cuco alleges that after she "zoned out" during the test, she later decided that he had tested the wrong side of her body.

On June 7, 2004, Zagula renewed Cuco's medical idle for seven days. Zagula Decl. at ¶25; Cuco Medical Records at BOP0011.

On June 9, 2004, Cuco was examined by a gynecologist at UKMC. The gynecologist diagnosed Cuco with menorrhagia (prolonged or excessive menstrual periods) and recommended a dilation and curettage ("D&C") and hysteroscopy be scheduled. Cuco Medical Records at BOP0106. Dilation is "stretching open the cervix or mouth of the womb" and curettage is "removing some of the lining of the womb." See Cuco Medical Records at BOP0111. Cuco alleges that during this visit, the UKMC physicians "scolded" her for missing an appointment for a D&C procedure that they had recommended be done immediately after her examination on April 24, 2004. Cuco alleges she was unaware of any such recommendation. The facts described above and Cuco's medical records indicate that Cuco's only contact with UKMC physicians in April was for a pelvic ultrasound on April 23, 2004, the results of which were not interpreted until April 30, 2004. The interpreting physician described the ultrasound as showing only "uterine fibroids, otherwise

14

unremarkable exam," with no ovarian cysts. Cuco Medical Records at BOP0083, 0101, 0112, 0118. The only medical record from FMC which suggests a possible appointment for Cuco at UKMC in May is a May 10, 2004 note from Dr. Schneider which states: *"Pt upset re: 'how long things are taking' Gyn to see on 5/20?"*. See Cuco Medical Records at BOP 0018. However, the medical records from UKMC are devoid of any reference to a May 20, 2004 appointment. Based solely on the documentary record, it appears that Cuco's June 9, 2004 appointment was the next interaction UKMC staff intended Cuco to have with its physicians.

Cuco was examined on June 18, 2004, by N.P. Moore. Cuco complained of rectal burning and requested renewal of her prescription for oral iron supplements. Moore renewed the prescription and issued "Tucks" pads for the burning. Moore Decl. at ¶27; Cuco Medical Records at BOP0011.

On June 24, 2004, Cuco's gynecologist at UKMC entered a note in her file that on June 9, 2004, Cuco was either recommended to have a hysteroscopy and D&C, or was actually scheduled to have the aforementioned procedures, but they did not occur. The gynecologist noted that Cuco appeared "very pale and tired today," and recommended that the surgery be scheduled as soon as possible. An additional note was added on June 30, 2004, that priority scheduling should be given to the request for purposes of scheduling an operating room. Cuco Medical Records at BOP0114. That same date, Shirley entered an administrative note in Cuco's file documenting that Cuco had seen a gynocologist at UKMC that day, had expressed her understanding of the treatment protocol, and was told to watch the call-out list for further appointments. Shirley Decl. at ¶24; Cuco Medical Records at BOP0011.

On July 12, 2004, Cuco was seen by Dr. Schneider with continued complaints of fatigue, dizziness, and epigastric pain. Schneider prescribed Elavil for Cuco's anxiety, indicated an intent

to consider a blood transfusion if her anemia symptoms worsened, but continued the oral iron tablets (ferrous gluconate) and Zantac (ranitadine) and Aciphex for her stomach and throat pain. Cuco signed the consent form for the Elavil. Cuco Medical Records at BOP0008.

On July 13, 2004, Cuco experienced an episode of chest pain and/or blacked out and fell down outside the cafeteria. Mendoza's examination revealed sinus tachycardia and clear lungs, but noted concerns related to anemia, anxiety, and dehydration. Cuco was kept for observation and provided medication for tachycardia (elevated heart rate). Mendoza Decl. at ¶¶29-33; Cuco Medical Records at BOP0006-7, 0079.

Cuco underwent a D&C and a hysteroscopy on July 26, 2004, which were the earliest dates the UKMC could schedule the procedures. Growse Decl. at ¶¶31, 32; Cuco Medical Records at BOP0006, 0008, 0106, 0114. The operative notes indicate that Cuco had a thickened endometrium, but with no fibroids. Growse Decl. at ¶35; Durbin Decl. at ¶20; Cuco Medical Records at BOP0094-96. The surgical pathology report indicated that curettages from the endocervix and endometrium displayed no evidence of dysplasia, hyperplasia, or carcinoma, with no evidence of malignancy. Cuco Medical Records at BOP0104-05.

On July 27, 2004, Cuco was examined by P.A. Zagula, who noted that Cuco complained of back pain at the anesthesia site. Zagula Decl. at ¶26-27. Cuco alleges she complained to Zagula that the site was bleeding and not being checked by staff as frequently as it should have been.

Roy Waller, III, M.D., performed an ultrasound on Cuco's left breast on July 30, 2004, at Samaritan Hospital. His report describes an oval mass in the left breast, approximately one centimeter in diameter, and recommended "prompt surgical evaluation" because the nodule "is not a simple cyst." Plaintiff was instructed to follow up with her outside physician/surgeon for biopsy,

16

since Plaintiff was scheduled to be released to a halfway house on August 11, 2004. Growse Decl. at ¶34; Cuco Medical Records at BOP0001, 0002, 0113.

Later that night on July 30, 2004, Cuco reported that she blacked out while walking to mail call. She was examined by Moore, who noted her unsteady gait and that she had consumed only two cups of water during her long day of testing. Cuco reported gastric burning but refused a "GI cocktail," a mixture of medications to address the gastrointestinal distress. A follow-up appointment was scheduled after Moore explained the necessity of consuming sufficient water to address symptoms arising from her anemia and gastric burning. Cuco Medical Records at BOP0003-04.

N.P. Moore examined Cuco on August 3, 2004, with complaints of nausea, headaches, and blurred vision and reports of blackouts. Moore wrote Cuco a prescription to address her symptoms and requested a consultation by a neurologist. Moore Decl. at ¶28; Cuco Medical Records at BOP0003.

On August 9, 2004, Cuco was provided with a copy of her medical file. During an examination by Zagula, Cuco was informed of the results of her most recent ultrasound and advised to promptly follow up with her physician in light of her imminent departure from FMC-Lexington to a halfway house. Zagula Decl. at ¶¶28-29; Cuco Medical Records at BOP0002.

On August 10, 2004, Shirley conducted an exit interview with Cuco during which she explained the proper usage of her ten medications and an explanation of the side effects. Shirley Decl. at ¶24; Cuco Medical Records at BOP0001.

On August 11, 2004, Cuco was released from FMC-Lexington to report to a halfway house in New Jersey. Booker Decl. at ¶4. Cuco was to remain there until the conclusion of her sentence on September 9, 2004, based on good conduct time.

17

## III. PROCEDURAL BACKGROUND

While still in custody, Cuco initiated the BOP grievance procedure under 28 C.F.R. §542.10-.19 by filing a Form BP-9 on April 28, 2004. In that grievance, Number 332314-F1, Cuco complained that her prescriptions had been filled with generic equivalents which her specialists had abandoned long ago; that her uterine fibroids had multiplied; that she suffered from headaches, blurred vision, and numbness in her extremities; that her bleeding had gone from 9-11 days to 18-19 days; that her oral iron treatments had caused her stomach problems to worsen; and that she had yet to see the results of a mammogram taken two months earlier. Cuco requested that she be seen by specialists in different medical fields for diagnosis and treatment. Declaration of Kevin J. Walasinski, Senior Attorney for BOP, attached as Exhibit 1 to Defendants' Motion ("Walasinski Decl.") at ¶8; Ex. B, pg. 9; Ex. C, pgs. 2-3. On May 14, 2004, her BP-9 grievance was denied, at least in part, by Warden Booker. Walasinski Decl. ¶8; Ex. B, pg. 9; Ex. C, pg. 1.

The same day, on May 14, 2004, Cuco filed a civil rights action pursuant to 42 U.S.C. §1983 against Warden Booker in this Court. *Cuco v. Booker*, Civil Action No. 04-218, Eastern District of Kentucky [Record No. 1 therein]. Because Cuco was suing federal, not state, officials, the Court recharacterized her complaint as asserting civil rights claims pursuant to the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). That complaint was dismissed without prejudice on May 28, 2004, for failure to demonstrate exhaustion of administrative remedies [Record No. 5 therein].

On May 27, 2004, Cuco filed her Form BP-10 (grievance No. 332314-R1) appealing Warden Booker's denial of her grievance on her medical claims to the Regional Office. See Walasinski Decl. ¶9; Ex. B, pg. 10; Ex. D, pgs. 2-3. However, the Regional Office rejected her appeal form the same

18

day. Such a rejection is not a "denial" of a grievance after consideration of its merits, but presumably a rejection of the appeal for failure to satisfy some formal filing requirement. Walasinski Decl. ¶9; Ex. B, pg. 10.

Two weeks later, on June 10, 2004, Cuco resubmitted her Form BP-10 to the Regional Office. Walasinski Decl. ¶9; Ex. B, pg. 11. The Regional Office again rejected Cuco's Form BP-10 the same day. Walasinski Decl. ¶9; Ex. B, pg. 11.

Almost a month later, Cuco resubmitted her Form BP-10 to the Regional Office on July 6, 2004. Walasinski Decl. ¶10; Ex. B, pg. 12. This time it appears the form was accepted for consideration. K.M. White, the Regional Director for the Mid-Atlantic Region, denied Cuco's appeal on August 6, 2004. Walasinski Decl. ¶10; Ex. B, pg. 12; Ex. D, pg. 1.

On August 17, 2004, Cuco appealed the Regional Director's denial by filing her Form BP-11 with the Office for National Inmate Appeals (grievance No. 332314-A1). Walasinski Decl. ¶11; Ex. B, pg. 13; Ex. E, pgs. 2-3. Harrell Watts, Administrator for National Inmate Appeals, denied Cuco's appeal on September 20, 2004. Walasinski Decl. ¶11; Ex. B, pg. 13; Ex. E, pg. 1.

Approximately ten months later, on June 6, 2005, Cuco filed her Complaint in the present action, asserting Eighth Amendment "deliberate indifference" claims under 42 U.S.C. §1983, disability discrimination claims under the ADA, 42 U.S.C. §12132, and Kentucky common law claims for negligence, gross negligence, and the intentional infliction of emotional distress. Cuco has named FMC-Lexington as a defendant, as well as (1) Warden Joe Booker, Jr.; (2) Associate Warden Belinda Snead; (3) Executive Assistant Rosie Harless; (4) Unit Manager Teri Ward; (5) Clinical Director Michael Growse, M.D.; (6) Linda de Hoyos, M.D.; (7) Pam Schneider, M.D.; (8) Susan Wilcox, Ph.D.; (9) Paulette Shirley, R.N.; (10) Quentin Moore, N.P.; (11) Rebecca Durbin,

19

P.A.; (12) Ranulfo Mendoza, P.A.; (13) Robert Williams, P.A.; (14) Phillip LaFleur, P.A.; and (15) Matthew Zagula, P.A.

On January 31, 2005, the BOP issued a decision rejecting Cuco's request for administrative settlement of her claims under the Federal Tort Claims Act, 28 U.S.C. §§2671-2680 ("FTCA"). The letter advised her that if she wished to pursue her claims she must file a civil action within six months of the date of the letter. Exhibit F to Cuco's Response. Two days short of six months later, on July 29, 2005, Cuco filed a complaint in the District of New Jersey alleging claims under the FTCA. She did not, however, allege exhaustion of her administrative remedies or attach the BOP's letter to her complaint. The district court dismissed the case *sua sponte* without prejudice on August 11, 2005, because Cuco had failed to demonstrate that she had exhausted her administrative remedies. *Cuco v. Federal Bureau of Prisons*, 05-3782, District of New Jersey [Record Nos, 1, 2 therein]. Cuco refiled her FTCA case on November 10, 2005, and that case remains pending. *Cuco v. United States and Federal Bureau of Prisons*, 05-5347, District of New Jersey [Record No. 1 therein].

In the present case, the defendants filed their Motion to Dismiss, or in the Alternative, for Summary Judgment, on October 3, 2005 [Record No. 21]. Cuco filed her Response [Record No. 23] and Motion to Amend Complaint to add a claim under the Rehabilitation Act, 29 U.S.C. §794 [Record No. 24], on November 16, 2005. Cuco thereafter filed a "Motion to Accept Amended Complaint" [Record No. 29] on December 16, 2005. The amended Complaint adds a new party, the United States, and adds a claim against the United States under the FTCA.

## IV. DISCUSSION

In their Motion and Reply, Defendants request dismissal of Cuco's Complaint on numerous

20

grounds:

1. Cuco's Section 1983 claim fails to state a claim because FMC-Lexington and each of the individual defendants acted under color of federal, not state, law;

2. Cuco's civil rights claims, even if construed as *Bivens* claims, are barred by the applicable one-year statute of limitations, KRS 413.140(1)(a);

3. Cuco's claims against FMC and the official capacity claims are barred by sovereign immunity;

4. Cuco's claims against the defendants employed by the Public Health Service are barred as they can only be asserted under the FTCA;

5. Cuco's "deliberate indifference" claims fail as a matter of law because her complaints about her treatment are conclusory, involve only a difference of medical opinion, and certain individual defendants were not directly involved in medical care decisions;

6. Cuco's individual capacity claims are barred by qualified immunity;

7. Cuco's ADA claim must fail because the ADA applies only to state entities, not federal entities or individuals acting under color of either state or federal law;

8. While Cuco did not assert a Rehabilitation Act claim, if she had, it would fail because (a) Cuco is not a "person with a disability" protected by the Rehabilitation Act; and (b) the BOP's activities do not fall within the definition of "programs or activities" regulated by its provisions; and

9. Cuco's common law tort claims against FMC and the official capacity claims, as well as the individual capacity claims, are barred by sovereign immunity and absolute immunity, respectively.

In her Response, Cuco asserts that her claims should not be dismissed because:

1. Cuco's claims did not accrue until she became aware of the extent of her injuries, which in some cases occurred upon her release from FMC, and in others it has yet to occur;

2. Cuco was required to exhaust her administrative remedies prior to asserting her claims under Section 1983 and the FTCA, and thus her claims were timely brought;

3.  the defendants, who refused to treat her anemia with intravenous iron notwithstanding their knowledge of her history of problems with oral iron supplements and its failure to address her medical condition under their own care, violated her rights under the Eighth Amendment;

4.  the individual defendants did not exercise their discretion reasonably and are therefore not entitled to absolute immunity to common law torts;

5.  FMC is liable under the Rehabilitation Act because it is subject to its provisions, Cuco has a "disability" within the meaning of the Act, and Cuco should be permitted to amend her Complaint to include such a claim;

6.  the Public Health Service defendants may be liable if they are employed by an independent contractor, rather than PHSemployees;

7.  a continuance should be granted pursuant to Rule 56(f) to permit Cuco to file affidavits which she could not, at the time the motion for summary judgment was filed, obtain and file in opposition;[3] and

8.  there are a number of genuine issues of material fact, including whether Cuco's anemia was "severe."

The Court will address each of the parties' contentions.

### A. Summary Judgment

#### 1. Characterization of Motion

The Defendants' Motion requests dismissal of Cuco's Complaint for lack of subject matter jurisdiction over some claims, and for failure to state a claim with respect to others. Fed.R.Civ.P. 12(b)(1), (6). In the alternative, Defendants request that the Court consider their motion as one for summary judgment in light of the extensive exhibits and affidavits submitted in support of their

---

[3] In particular, Cuco asserts that she needs to determine the names of certain doctors (presumably those at UKMC and Good Samaritan Hospital) who treated her during her stay at FMC-Lexington and recommended that her severe anemia be treated with intravenous iron and/or Depo Provera, not oral iron supplements. Cuco also indicates that because of her busy work schedule and that of certain medical specialists in New Jersey, she has been unable to obtain their affidavits regarding her diagnosis and recommended treatment. Response at 29-32.

Motion. Fed.R.Civ.P. 56(b). In her Response, Cuco has treated the Defendants' Motion as one for summary judgment, and in support of her Response has submitted extensive exhibits, two affidavits of her own, and one from her treating physician in New Jersey.

Rule 12 of the Federal Rules of Civil Procedure provides, in pertinent part:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided for in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(b). In light of the foregoing, the Court will evaluate Defendants' Motion as one seeking summary judgment. *Mays v. Buckeye Rural Elec. Co-op, Inc.*, 277 F.3d 873, 877 (6th Cir. 2002) (district court may properly consider motion to dismiss as one for summary judgment when invited to consider matters outside the pleadings); *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 493 (6th Cir. 1995); *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (where defendant moves both to dismiss and for summary judgment, plaintiff is on notice that summary judgment is being requested, and the court's consideration as such is appropriate where the nonmovant submits documents and affidavits in opposition to summary judgment); *compare RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (when assessing a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the burden remains at all times with the plaintiff to establish jurisdiction, and the court is free to weigh the evidence).

## 2. Applicability of Defendants' Motion to Defendant Schneider

The Defendants have filed their Motion on behalf of the "federal defendants," a term which the Defendants have defined as including all of the named defendants except Pam Schneider, M.D.

The Defendants assert that Schneider was a contract physician and was not directly employed by the BOP. Defendants' Motion at 1 nn.1, 2. The Defendants' exclusion of Dr. Schneider from their motion to dismiss presents a procedural and technical anomaly that merits brief discussion.

Cuco has filed with the Court returns of summons for twelve of the fifteen named individual defendants [Record Nos. 2-14], but did not do so for named defendants Rebecca Durbin, Paulette Shirley, and Pam Schneider. Without service of summons upon a named defendant, the Court lacks personal jurisdiction over that defendant. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987) ("[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."). Nonetheless, on August 4, 2005, "the defendants" filed a Motion for Extension of Time to File Answer [Record No. 16]. This motion states on its face that it was filed on behalf of "the defendants," an inclusive description which does not, by its terms, exclude any defendant named in the Complaint from the scope of the motion. Any named but unserved defendant who files such a motion without reserving any objections to the Court's personal jurisdiction over him thereby waives any such objection, including any failure to serve summons. Fed.R.Civ.P. 12(h)(1)(B); *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978) ("Case law is unanimous in holding ... that where a defendant files a pre-answer motion to dismiss or an answer, without raising the defense of a lack of in personam jurisdiction, he waives any objection to that defect.").

The question, then, is whether Dr. Schneider should be considered one of the movants in the Defendants' motion for extension of time to file an answer. The answer to this question is important because if she was a participant in the motion for extension of time, she may have waived any defect in service. If so, her subsequent non-participation in the Defendants' Motion places her in jeopardy

24

of default in light of the authorities cited above. This is so because Dr. Schneider would have made an appearance by filing the motion for an extension, and in so doing waived (along with defendants Durbin and Shirley) the defect in personal jurisdiction, and then failed to file an answer or motion to dismiss within the time granted by the Court's Order.[4]

The answer to that question highlights an apparent shortcoming in the Court's own electronic filing system. On its face, the Defendants' motion for an extension of time appears to be filed on behalf of all named defendants. However, a review of the Court's PACER database indicates that counsel for the "federal Defendants" is not identified on the docket sheet as counsel for Dr. Schneider. The Court assumes that this is so because, in the process of electronically filing the motion for extension of time, counsel for the "federal defendants" identified herself as such for each named "federal" defendant, but not for Dr. Schneider. See ECF User Manual, pg. 21, Step 4. The difficulty is caused by the disparity between the *apparent* scope of counsel's appearance to the Court as determined from the face of the documents filed and served, and the *actual* scope of her appearance, discernible only from a careful review of the Court's PACER database, which is not a formal part of the record. Opposing counsel may get an accurate assessment of counsel's appearance, as it is included in the "Notice of Electronic Filing" generated and e-mailed to opposing counsel each time a document is electronically filed by counsel. See Amended Electronic Case Filing Administrative Policies and Procedures ("AECF-APP") §§1.3, 4(a), incorporated by reference

---

[4] Were the Court to conclude either (a) that the Defendants' motion to extend time to file an answer, in which Schneider is an apparent participant, is *not* the kind of motion which can result in a waiver of defects in personal jurisdiction under Rule 12(h)(1)(B), or (b) that Schneider was not a participant in that motion, then Cuco's claims against Dr. Schneider are subject, at least, to dismissal without prejudice, because Cuco has failed to serve Schneider with summons within 120 days after the filing of the Complaint as required by Rule 4(m).

in General Order 06-01 dated February 8, 2006. In light of the Court's rules regarding the procedure and effect of electronic filing, particularly AECF-APP §§1.3, 4(a), the Court concludes that Dr. Schneider was not a participant in the "federal Defendants'" motion to extend time to file an answer, and therefore did not waive any objection to the Court's personal jurisdiction over her.

As noted above, Cuco's failure to serve Schneider would permit the Court to dismiss the claims against her for failure to serve her with summons within 120 days pursuant to Rule 4(m). However, because such dismissal would only be without prejudice, in the interests of judicial economy, the Court will instead review Cuco's claims against her in the course of its review of the claims against all defendants.

For purposes of its present review, the Court will assume, without deciding, that Dr. Schneider may be considered a federal actor subject to civil rights liability. *See, e.g., Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 698 (6th Cir. 1996) (a federal 'actor' need not be on the government payroll to be considered a federal official, but need only be authorized to perform a government task; private attorneys who helped federal marshals execute an ex parte order may be sued under *Bivens* doctrine).

Because Cuco has paid the filing fee, the Court may not screen her Complaint under the *in forma pauperis* statute under 28 U.S.C. §1915(e)(2). *Benson v. O'Brian*, 179 F.3d 1014, 1016-17 (6th Cir. 1999). Although Cuco is suing government officials arising out of her treatment while a prisoner, she was no longer confined at the time she filed suit, and hence the Court may not screen her Complaint pursuant to 28 U.S.C. §1915A. *Hyland v. Clinton*, 3 Fed. Appx. 478, 479 (6th Cir. 2001) (unpublished disposition); *Kane v. Lancaster County Dept. of Corrections*, 960 F.Supp. 219, 221 (D.Neb. 1997); *contra Johnson v. Hill*, 965 F.Supp. 1487, 1489 (E.D.Va. 1997). But even where

26

the plaintiff has paid the filing fee and is represented by counsel, a district court may screen a complaint *sua sponte* at any time to determine if its allegations are insubstantial, frivolous, or devoid of merit and, if appropriate, dismiss it for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999) (citing *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974)).

### 3. Motion to Delay Consideration Pursuant to Rule 56(f)

Before it can consider the merits of Defendants' Motion, the Court must decide whether to grant Cuco's request to delay consideration of the Motion pending further discovery pursuant to Rule 56(f). That rule provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In her Response, Cuco explains that she needs discovery to:

> (1) determine the names of doctors who examined her outside of FMC-Lexington, and to depose them to determine their opinions on the proper treatment of her anemia;

> (2) resolve a factual dispute regarding the severity of her anemia, and to obtain affidavits from her specialist physicians in New Jersey regarding its proper treatment, affidavits that scheduling conflicts have prevented her from obtaining.

Cuco identifies two affidavits as offered in support of her Rule 56(f) motion: that of her treating physician, Joseph Ballaro, which states only that her anemia is severe and not adequately treatable with oral iron, and her own second affidavit, where Cuco notes that her recollection of what the "outside" doctors told her about her condition varies dramatically from the declarations offered by FMC's medical staff. Cuco Response, Exhibits N, O.

27

In evaluating a motion under Rule 56(f), the Court is mindful that granting summary judgment is improper where the nonmovant is not given an adequate opportunity for discovery. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627-28 (6th Cir. 2002); *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231-32 (6th Cir. 1994).

To invoke the protections of Rule 56(f), the nonmovant must file an affidavit in response to the summary judgment motion which details the discovery needed and demonstrates specific reasons why the nonmovant cannot oppose the summary judgment motion without it. *United States v. One Harrington & Richardson Rifle*, 378 F.3d 533, 535 (6th Cir. 2004). General and conclusory assertions that more discovery is needed are not enough: the affidavit must be detailed and specific. *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004); *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003) (nebulous assertions of additional time for discovery are insufficient). Not only must the nonmovant explain why the facts it seeks are material, it must explain why it has not previously discovered the information. *Toms v. Taft*, 338 F.3d 519, 523-24 (6th Cir. 2003) (more time for discovery not warranted where party sought information that was not relevant to dispositive question); *Ball*, 385 F.3d at 720; *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) ("Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.").

In deciding whether to grant additional time to conduct discovery, a court may consider whether the desired information could change the outcome of the summary judgment motion, how long the nonmovant had to obtain information on the issue, whether the nonmovant was diligent in its efforts to gather that information, and whether the movant cooperated in discovery. *Plott v. Gen.*

*Motors Corp.*, 71 F.3d 1190, 1196-97 (6th Cir. 1995).

Based on the foregoing authorities, Cuco's motion must be denied for a number of reasons.

First, the information that Cuco indicates she needs is relevant solely to the propriety and adequecy of her medical treatment. Therefore, it is relevant to only one of the many arguments raised by the Defendants in their motion. For example, the information Cuco seeks has no bearing upon Defendants' arguments relating to sovereign immunity, the statute of limitations, or whether the BOP's medical treatment of Cuco is a "program or activity" covered by the ADA. The medical information Cuco seeks would be relevant, if at all, solely to whether an Eighth Amendment violation occurred. Even in this regard, the Court notes that a claim of deliberate indifference to serious medical needs under the Eighth Amendment is not a medical malpractice claim: the determinative issue is not whether the Defendants met the applicable standard of care, but rather whether they inflicted punishment that was "cruel and unusual." *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) ("malpractice does not violate the Eighth Amendment; instead the suit charges that the defendants inflicted cruel and unusual punishment on the plaintiff by refusing to treat his condition."). But the Court cannot delay consideration of even this claim, because the Defendants have asserted qualified immunity, a defense not merely to liability, but an immunity from suit. *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) ("the defense of qualified immunity is a threshold question, if the defense is properly raised prior to discovery, the district court has a duty to address it"); *Sallier v. Brooks*, 343 F.3d 868, 873 (6th Cir. 2003) (district court errs by reserving ruling on a defendant's qualified immunity defense until the jury makes a factual determination as to whether each occurrence constitutes a constitutional violation); *Toms*, 338 F.3d at 523-24; *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987) (issue of qualified immunity should not

29

normally be avoided out of concern for need for further factual development).

In addition, during her incarceration, Cuco repeatedly requested and was given copies of her medical records, including upon her departure to the halfway house. Cuco's Medical Records at BOP0037, 0002. The Court also notes that Cuco waited nearly ten months after her August 2004 release to file this action in June 2005. Cuco was aware of the outside facilities at which she was treated, including UKMC and Good Samaritan Hospital, and during that time period could have requested copies of her medical records directly from those facilities. Even if she were not aware of all of the facilities at which she was treated, Cuco could have requested copies of her medical records through the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, or made a request for her records directly to the BOP under Program Statement 6090.01(18)(a), (b). These medical records would provide Cuco with the information she now claims a need for, and her failure to obtain them, when the ability to do so was within her own control, through readily-available public channels outside of a formal discovery process, for over a year after her release, counsels strongly against granting a delay to obtain them now. *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000).

Finally, in her Response Cuco complained that she was seeking to obtain affidavits from her own physicians in New Jersey to offer in rebuttal to Defendants' Motion, but that she had been unable to obtain them in the tight time frame to file her Response because of her doctors' busy schedules. Cuco's Response was filed on November 16, 2005, and six months have passed without Cuco having filed or tendered any supplement into the record including any such affidavits. Cuco's failure to avail herself of the opportunity to supplement the record is another basis to deny a continuance for further discovery. *Funtanilla v. Rubles*, 2003 WL 21309491, *2 (N.D.Cal. 2003)

30

(unpublished disposition) ("Funtanilla's opposition brief was filed almost six months ago and he has not provided any more evidence since then ... indicating a lack of diligence by him in obtaining and presenting the materials to this court."); *see also Tunnell v. Wiley*, 514 F.2d 971, 976 (3rd Cir. 1975); *Cooper v. John D. Brush & Co.*, 242 F.Supp.2d 261, 266-67 (W.D.N.Y. 2003).

### 4. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides both the mechanism and the standard for summary adjudication of claims prior to trial. It provides, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992). The rule, by its terms, requires a determination of what the applicable law requires and an assessment of the facts presented by the parties. The Court must examine the facts alleged by the movant and nonmovant, and in light of the law applicable to the nonmovant's claim, determine if the movant is entitled to judgment as a matter of law because the nonmovant has failed to present sufficient evidence to sustain a jury verdict in his favor with respect to at least one essential element of his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). If the totality of the evidence submitted "would require a directed verdict for the moving party," summary judgment is required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

31

The moving party initiates a process of shifting burdens by making an initial demonstration that the nonmovant lacks evidence to support one or more essential elements of his claim. *Celotex*, 477 U.S. at 324-25. The movant does not need to support its motion with affidavits or other evidence to negate the nonmovant's claim, *Id.* at 323; *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 140 (6th Cir. 1997), but need only point out that there is no evidence to support the nonmovant's case, *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005); *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004).

In response, the nonmovant must demonstrate the existence of specific facts which show that there is a genuine issue of material fact for trial. He cannot rely merely on the pleadings but must specifically designate affidavits, depositions, interrogatory responses, and admissions which support his position on the facts. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986); *Hunley v. DuPont Auto*, 341 F.3d 491, 496 (6th Cir. 2003); *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004); *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) ("A trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to "wade through" the record for specific facts."); *Guarino v. Brookfield TP Trs.*, 980 F.2d 399, 404-06 (6th Cir. 1992) (collecting cases and discussing at length the obligations of the respective parties in moving and opposing summary judgment and the role of the court in analyzing the issues raised by the parties). A verified complaint should be considered as evidence, as should a declaration that complies with 28 U.S.C. §1746. *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1089 (6th Cir. 1998); *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993); *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). While the nonmovant's evidence need not be in a *form* that would be admissible at trial, *Celotex*, 477 U.S. at 324 (affidavit of nonmovant acceptable in

32

absence of deposition transcript), the *content* of his evidence must be admissible, *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (hearsay evidence cannot be considered).

A fact is a "material fact" only if its existence or nonexistence might affect the disposition of the claim under the applicable substantive law. *Anderson*, 477 U.S. at 248; *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451-52 (6th Cir. 2004); *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003).

An issue is only a "genuine issue" if the evidence offered by the nonmovant to support his claim would be sufficient to support a jury's verdict in his favor. *Anderson*, 477 U.S. at 251. If the applicable substantive law requires the nonmovant to meet a higher burden of proof, his evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial. *Harvey v. Hollenback*, 113 F.3d 639, 642 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993).

When determining whether there is a genuine issue for trial, the court must view the totality of the evidence in a light most favorable to the nonmovant, and draw all reasonable inferences therefrom in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). The court may assess the plausibility of the inferences desired by the nonmovant where the evidence offered to support them is circumstantial, but the court must accept direct evidence as true and not question its credibility. *Matsushita*, 475 U.S. at 587; *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).

In sum, even in the face of evidence offered by the nonmovant in favor of his case, the court may still grant summary judgment for the movant if it determines that the evidence is "so one-sided

33

that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 248. Should the court determine that the nonmovant cannot carry his burden with respect to a single essential element of his case, all other facts are rendered immaterial, and summary judgment for the movant is required. *Celotex*, 477 U.S. at 322-23.

The Court will analyze each of Cuco's claims applying the foregoing principles.

### B. Cuco's Civil Rights Claims under Section 1983 and/or *Bivens*.

Cuco has named as defendants in this action FMC-Lexington as well as fifteen named individuals. For her civil rights claims pursuant to Section 1983 against these individuals, Cuco has sued each defendant in both his or her official and individual capacity.

### 1. Claims Asserted under Section 1983 are Construed as Asserting *Bivens* Claims.

The Civil Rights Act of 1871 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. ...

42 U.S.C. §1983. The Defendants first assert that Cuco has failed to state a claim against any of the named defendants because each acted under color of federal, rather than state, law, citing *Hindes v. F.D.I.C.*, 137 F.3d 148, 158 (3rd Cir. 1998) (federal entities function under color of federal, not state, law); *Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997); *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2nd Cir. 1991).

34

Defendants' assertion is plainly correct. *Risley v. Hawk*, 918 F.Supp. 18, 21 (D.D.C. 1996),

*aff'd*, 108 F.3d 1396 (D.C. Cir. 1997) (federal prisoner's claims against federal employees arising

out of treatment at federal prison involved no state action to support Section 1983 claim). Cuco does

not contest this proposition, but instead appears to assume that this Court will construe her claims

as arising directly under the Constitution of the United States in the manner described by the

Supreme Court in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). Such an

assumption, particularly for a plaintiff represented by counsel learned in the law, is a perilous one,

*Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.), Inc.*, 263 F.Supp.2d 140, 148 (D.Mass.

2003) ("while the allegations of the complaint are construed favorably to the plaintiff, the court will

not read causes of action into the complaint which are not alleged."); *United States v. Zannino*, 895

F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some

effort at developed argumentation, are deemed waived ... It is not enough merely to mention a

possible argument in the most skeletal way, leaving the court to do counsel's work, create the

ossature for the argument, and put flesh on its bones."), but one which the Court will nonetheless

indulge. The Court will therefore construe Cuco's Complaint as asserting *Bivens* claims against the

BOP and the named individual defendants and analyze them accordingly.

### 2. Claims Against the Individual Defendants in their Official Capacities Constitute Claims Against FMC-Lexington.

In addition to naming FMC-Lexington, Cuco has asserted claims against each of the named

individual defendants in his or her official capacity. As the Sixth Circuit has explained:

> The distinction between individual capacity and official capacity suits has been
> addressed by the United States Supreme Court on numerous occasions. In *Brandon
> v. Holt*, 469 U.S. 464 (1985) . . . [the Court] held that a judgment against an official
> "'in his official capacity' imposes liability on the entity that he represents provided,

of course, the public entity received notice and an opportunity to respond." *Brandon*, 469 U.S. at 471-72. That same year, the Supreme Court decided *Kentucky v. Graham*, 473 U.S. 159 (1985), reaffirming the proposition that official capacity suits "generally represent only another way of pleading an action against the entity of which an officer is an agent." *Id.* at 165 (quoting *Monell v. Department of Social Servs.*, 436 U.S. 658, 690, n.55 (1978)). ". . . [U]nder *Monell*, *supra*, local government units can be sued directly for damages and injunctive or declaratory relief." *Id.* at 167, n.14.

*Bush v. Rauch*, 38 F.3d 842, 848-49 (6th Cir. 1994). So construed, all of the "official capacity" claims will be considered as redundant to the claim against the BOP and will be considered simultaneously therewith.

### 3. Cuco's *Bivens* Claim against FMC-Lexington is Barred by Sovereign Immunity.

In her Complaint, Cuco seeks only damages against each of the Defendants, and seeks neither injunctive nor declaratory relief expressly. A lawsuit against FMC-Lexington, as an agency of the United States, is in essence a suit against the United States. *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985). Federal courts lack subject matter jurisdiction to consider a claim for damages against the United States in the absence of a clear waiver of sovereign immunity. *United States v. Mitchell*, 463 U.S. 206, 212-14 (1983); *The Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 115-16 (6th Cir. 1988).

The United States has not waived its sovereign immunity to damage claims for constitutional torts. *Clark v. Library of Congress*, 750 F.2d 89, 103-04 (D.C. Cir. 1984). FMC-Lexington is therefore immune from suit for damage claims for alleged violations of Cuco's civil rights. *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991); *Nuclear Transport & Storage, Inc. v. United States*, 890

F.2d 1348, 1352 (6th Cir. 1989).[5] Indeed, a *Bivens* claim may only be stated against federal officials in their individual capacities, and not against federal agencies. *FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994) (*Bivens* type action cannot be implied directly against federal agencies); *Shaner v. United States*, 976 F.2d 990, 994 (6th Cir. 1992); *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Based on the foregoing, Cuco's claim against FMC-Lexington under *Bivens* is subject to dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction as barred by sovereign immunity under *Berger* and fails to state a claim under Rule 12(b)(6) under *Meyer*.[6]

### 4. *Bivens* Claims against Named Defendants in Their Individual Capacities.

Cuco has also asserted a *Bivens* claim against each of the individually named defendants in his or her individual capacity. The claims against each defendant are analyzed below.

### (a) The *Bivens* Claims against Defendants Employed by the Public Health Service are Barred by the FTCA's Exclusivity Provision.

Defendants Moore, LaFleur, and Zagula each allege that they are "employed by the United States Government" and are "commissioned officer[s] with the United States Public Health Service (PHS) as a PHS Officer." Moore Decl. at ¶¶1, 2; LaFleur Decl. at ¶¶1, 2; Zagula Decl. at ¶¶1, 2. Employees of the PHS may only be sued under the Federal Tort Claims Act:

> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for

---

[5] The exception described in *Larson v. Domestic and Foreign Corp.*, 337 U.S. 682, 689-91 (1949), permitting official capacity suits where the challenged actions of the official are beyond the official's statutory authority, does not apply here where Cuco (1) seeks damages instead of specific injunctive relief and (2) has asserted in her Complaint that each of the defendants acted directly pursuant to his or her authority.

[6] Even if the Court were to conclude otherwise, the Court notes that certain of Cuco's *Bivens* claims against FMC-Lexington are barred by the applicable statute of limitations. Given the complexity of the statute of limitations analysis in this case, to avoid repeating that discussion it is set forth once *infra*.

> personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

42 U.S.C §233(a). Because this section makes the FTCA an inmate's sole remedy for injuries allegedly received at the hands of Public Health Service Officers acting within the scope of their employment, a federal inmate cannot maintain an action under *Bivens* against prison doctors for acts or omissions made while performing their official tasks. *Seminario Navarrete v. Vanyur*, 110 F.Supp.2d 605, 606-07 (N.D.Ohio 2000); *Lewis v. Sauvey*, 708 F.Supp. 167, 169 (E.D. Mich. 1989) (PHS officer immune from *Bivens* liability); *Brown v. McElroy*, 160 F.Supp.2d 699, 702-03 (S.D.N.Y. 2001).

Cuco has responded by asserting that when a PHS defendant is found immune from liability under Section 233(a), the United States "stands in the shoes" of that defendant, citing *Cuoco v. Moritsugu*, 222 F.3d 99, 108 (2nd Cir. 2000). But this is to say nothing more than that if the plaintiff has a remedy, it is solely a claim against the United States under the FTCA. *See Brown*, 160 F.Supp.2d at 702. And while Cuco does not directly deny that these defendants are PHS officers, nor offers any evidence to contradict their assertion to this effect, she obliquely suggests, without evidentiary support, that these defendants might only be contract employees of an organization that itself contracts with FMC for medical services, and thus fall outside the scope of Section 233(a). *See* 42 U.S.C. §233(g)(1)(A) (broadly defining those persons or entities who "shall be deemed to be an employee of the Public Health Service"); *Allen v. Christenberry*, 327 F.3d 1290, 1296 (11th Cir. 2003). But this suggestion directly contradicts the Defendants' sworn declarations that they are

38

"employed by the United States Government" and are "commissioned officer[s] with the United States Public Health Service (PHS) as a PHS Officer." Cuco has offered nothing but suggestion, unsupported by evidence, in support of her assertion. Because Cuco has failed to specifically identify evidence to support her factual allegation in this regard, she has failed to demonstrate the existence of a genuine issue of material fact precluding summary judgment on this issue. Fed.R.Civ.P.56(e); *Hunley v. DuPont Auto*, 341 F.3d 491, 496 (6th Cir. 2003). Cuco's *Bivens* claims against Moore, LaFleur, and Zagula will be dismissed.

### (b) FMC's Administrative Staff had No Personal Involvement in Cuco's Medical Care.

The Defendants assert that Defendants (1) Warden Booker; (2) Executive Assistant Harless; (3) Associate Warden Snead; and (4) Unit Manager Ward, as part of the administrative rather than medical staff, cannot be held personally liable for any claim arising out of Cuco's medical care because they were in no way personally involved in deciding what medical care Cuco would and would not receive.

In order to recover against a given defendant in a *Bivens* action, the plaintiff "must allege that the defendant [was] personally involved in the alleged deprivation of federal rights." *Nwaebo v. Hawk-Sawyer*, 83 Fed.Appx. 85, 86, 2003 WL 22905316, *1 (6th Cir. 2003) (unpublished disposition) (*citing Rizzo v. Goode*, 423 U.S. 362, 373-77 (1976)). The requirement of personal involvement does not mean that the particular defendant actually committed the conduct complained of, but it does require a supervisory official to have "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct." *Hays v. Jefferson County, Kentucky*, 668 F.2d 869, 874 (6th Cir. 1982). The mere fact of supervisory capacity is not enough: *respondeat*

*superior* is not an available theory of liability. *Polk County v. Dodson*, 454 U.S. 312, 325-26 (1981); *Williams v. Faulkner*, 837 F.2d 304, 308 (7th Cir. 1988), *aff'd*, 490 U.S. 319 (1989). At a minimum, the facts must support the allegation that the supervisor condoned the activity giving rise to a constitutional violation. *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989). At the summary judgment stage, the evidence offered by the plaintiff must be sufficient to "justify an inference of personal involvement in the alleged deprivation of medical care." *Williams*, 837 F.2d at 308.

The Court will assess Cuco's allegations against each administrative or supervisory official in turn.

### 1. Defendant Booker.

Cuco alleges that Defendant Booker heard her fears and concerns about inadequate medical care during the "chicken day" visit, but her concerns "fell on deaf ears." Cuco Response at pgs. 7-8. Booker sent written responses to family members who complained about Cuco's medical care. Defendants' Motion, Exh. G-K. Booker also denied Cuco's administrative grievance [Form BP-9] on May 14, 2004. Walasinski Decl. ¶8; Ex. B, pg. 9; Ex. C, pg. 1. For his part, Defendant Booker states that he is the Warden at FMC-Lexington, that he has no medical training, and that he delegates all individualized medical determinations to the medical staff. Booker Decl. at ¶¶1, 9, 6, 8.

Booker was not directly involved in Cuco's medical care, nor did he act to facilitate a constitutional violation in any manner sufficient for liability to attach. Booker's capacity as warden cannot justify the imposition of liability: there is no *respondeat superior* liability here. *Polk County*, 454 U.S. at 325-26. Nor is there evidence to "justify an inference of personal involvement in the alleged deprivation of medical care" sufficient to withstand a motion for a directed verdict. *Birrell*, 867 F.2d at 959 (6th Cir. 1989); *Williams*, 837 F.2d at 308. This is not a case where an inmate was

40

denied needed medical care: Cuco was provided with abundant medical examination, diagnosis, and treatment. Rather, Cuco alleges that the medical staff's choice between alternative therapeutic options was, in light of her manifest symptoms and medical history, so egregiously in error as to constitute a violation of her civil rights. But Booker has no medical training and made no assessment of the medical appropriateness of treating severe anemia with oral iron supplements instead of intravenous iron. This claim must be dismissed. *Deaton v. Montgomery Cty., Ohio*, 989 F.2d 885, 889 (6th Cir. 1993) (to establish causation, a plaintiff must show that defendants' conduct was "[a] moving force that animated the behavior ... that resulted in the constitutional violations alleged.").

Further, Booker's denial of Cuco's administrative remedy request does not create any causal connection to the medical care about which she complained. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Nor does responding, in general terms and based upon information supplied to him by medical staff, to letters of concern from families and state senators. Cuco's *Bivens* claims against Defendant Booker must be dismissed because Booker was not sufficiently involved in her medical treatment to warrant the imposition of liability.

### 2. Defendant Harless.

Cuco alleges that Defendant Harless met with her in January 2004 and promised to help her get the medical attention she needed, but never did so. Cuco Response at pg. 4. Cuco further alleges that she passed out in front of Harless on July 18, 2004, but was only given intravenous fluids. Cuco Response at pg. 7. Defendant Harless states that she is the Executive Assistant and Camp Administrator at the Atwood Camp where female inmates are housed, that she has no medical training, and that she delegates all individualized medical determinations to the medical staff.

41

Harless Decl. at ¶¶1, 9, 6, 8. As with Defendant Booker, there is no sufficient showing that Harless was directly involved in making decisions about Cuco's medical care, nor any basis upon which to infer that she condoned any violation of Cuco's constitutional rights. *White v. Gerbitz*, 892 F.2d 457, 463 (6th Cir. 1989) (liability only attaches where the plaintiff establishes causation by affirmatively showing that the official was personally involved in the deprivation of the plaintiff's rights). Because there is not sufficient evidence of personal involvement to withstand a motion for a directed verdict on Cuco's *Bivens* claim, summary judgment is warranted. *Birrell*, 867 F.2d at 959.

### 3. Defendant Snead.

Cuco alleges that Defendant Snead denied her January 15, 2004 request for a consultation with a hematologist. Cuco Response at pg. 17 n.18; Cuco Affidavit at pg. 14. Snead responded in writing to Cuco's January 15, 2004 request for a consultation with a hematologist on February 5, 2004, indicating that as soon as diagnostic tests requested on January 29, 2004 have been completed, Cuco could review the results of those tests with the primary care physician as already determined by FMC medical staff. Cuco's medical records indicate that blood tests were performed on December 2, 2003; January 23, 2004; March 1, 2004; and April 19, 2004. Cuco Medical Records at BOP0030, 0046, 0052-78. Defendant Snead states that prior to her retirement she was the Associate Warden of Clinical Programs at FMC-Lexington, that she has no medical training, and that she delegated all individualized medical determinations to the medical staff. Snead Decl. At ¶¶1, 9, 7, 8. For the same reasons identified above regarding Defendants Booker and Harless, the evidence in the record to support an inference of Snead's personal participation in decisions regarding Cuco's medical care is not sufficient to withstand a motion for a directed verdict, and summary judgment will therefore be granted. *Birrell*, 867 F.2d at 959; *Shehee*, 1999 F.3d at 300.

42

## 4. Defendant Ward.

Cuco alleges that Defendant Ward saw her in the corridor on March 11, 2004, and told her to send her "cop-out" forms so that she could be treated properly. When Cuco did so, Ward responded only that each of her requests would be discussed, reviewed, and/or addressed during her next scheduled medical appointment. Cuco Response at pg. 5; Ward Decl. at ¶¶13-16; Exhs. M-P. Cuco further alleges that she passed out in front of Ward on July 18, 2004, but was only given intravenous fluids. Cuco Response at pg. 7. Cuco alleges that Ward denied her request for a consultation with a hematologist. Cuco Response at pg. 17 n.18; Cuco Affidavit at pg. 14. Defendant Ward states that she is the Unit Manager at FMC-Lexington, that she has no medical training, and that she delegates all individualized medical determinations to the medical staff. Ward Decl. at ¶¶1, 8, 6, 7.

Where Cuco was receiving continuous medical care by trained medical staff, Ward's responses to Cuco's "cop-out" requests is not a sufficient basis upon which to infer her personal involvement with medical decisions regarding Cuco's care. *Shehee*, 1999 F.3d at 300. There is no basis upon which to infer that she condoned any violation of Cuco's constitutional rights. *Horn by Parks v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994) (plaintiff's theory of causation must be established by more than pure speculation). Summary judgment is therefore appropriate for Defendant Ward. *Birrell*, 867 F.2d at 959.

### (c) Certain of Cuco's *Bivens* Claims against the Remaining Named Individual Defendants are Barred by the Statute of Limitations.

The Court's analysis in the prior sections leaves *Bivens* claims against only Defendants Growse; de Hoyos; Schneider; Wilcox; Shirley; Durbin; Mendoza; and Williams, although the

following discussion applies with equal force to all named defendants. The Defendants assert that the civil rights claims raised by Cuco are barred by the applicable statute of limitations.[7] Given the number of defendants, the variety of medical issues presented by Cuco in her Response, and procedural prerequisites to suit, this matter requires significant dissection and analysis.

### 1. KRS 413.140(a)(1) Supplies the Applicable Statute of Limitations.

The answer to the threshold question of the applicable statute of limitations is well settled. Because Section 1983 does not provide its own statute of limitations, federal courts "borrow" the most analogous statute of limitations in the state where the events giving rise to the claim occurred. *Wilson v. Garcia*, 471 U.S. 261, 276-80 (1985). Because the events complained of occurred in Lexington, Kentucky, Kentucky law supplies the applicable statute. *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996). In Kentucky, the applicable statute to be borrowed for civil rights claims is the one-year statute of limitations for residual tort claims found in KRS 413.140(1)(a). *Collard v. Kentucky Board of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990); *University of Kentucky Bd. of Trustees v. Hayse*, Ky., 782 S.W.2d 609, 613 (1989).

### 2. When Cuco's Various Claims Accrued.

While Kentucky law supplies the applicable statute of limitations, a federal court does not "borrow" Kentucky's law of claim accrual; rather, federal law supplies its own rule of claim accrual for civil rights claims. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996) (citing *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984)); *Heard v. Sheahan*, 253 F.3d 316, 317-18 (7th Cir. 2001). As

---

[7] Dr. Schneider has made no appearance in this case, and hence has not raised the statute of limitations as an affirmative defense. Nonetheless, a court may dismiss a complaint *sua sponte* on screening where the claim is self-evidently time-barred from the undisputed facts in the record. *Stimac v. Bostick*, 7 F.3d 235, 1993 WL 384999, *1 (6th Cir. 1993) (unpublished disposition); *Martin v. Wigginton*, 999 F.2d 540, 1993 WL 243776, *1 (6th Cir. 1993) (unpublished disposition).

a general rule, a cause of action "accrues" and the statute of limitations thereon begins to run when a plaintiff knows, or has reason to know through the exercise of reasonable diligence, of the injury that provides the basis for the claim. *Collard*, 896 F.2d at 183; *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005); *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991); *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991) (courts look for the event that should alert a typical lay person to protect his or her rights).

Cuco responds to Defendants' argument that her *Bivens* claims are time-barred by arguing that her claims did not accrue until she knew the full extent of her injuries resulting from the Defendants' allegedly inadequate medical care. Cuco further asserts that for some of her injuries, she is even now unaware of the full extent of her injuries. However, if Cuco's approach were utilized, her claims related to injuries for which she is not yet fully aware of the extent of the damage would have to be dismissed as prematurely brought. But more fundamentally, Cuco's argument is simply contrary to the law: a plaintiff need not know the full extent of her injuries before her claim accrues, she must merely be sufficiently aware of her injury to put her on inquiry notice. *Friedman*, 929 F.2d at 1159 (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) ("Any fact that should excite [the plaintiff's] suspicion is the same as actual knowledge of his entire claim."); *Barcume v. City of Flint*, 819 F.Supp. 631, 635 (E.D.Mich. 1993) (limitations period begins to run in response to acts themselves and not in response to the continuing effects of past conduct).

Cuco filed her Complaint in the present action on June 6, 2005. Direct application of the one-year statute of limitations provided by KRS 413.140(a)(1) would thus indicate that any claim which accrued prior to June 6, 2004, is time-barred. Defendants assert that because the course of

45

treatment about which Cuco now complains began well before this date, all of her medical claims are therefore time-barred. However, determining which claims are time-barred is complicated by consideration of two applicable principles: equitable tolling and the continuing violations doctrine.

### 3. Equitable Tolling for Exhaustion of Administrative Remedies.

While most plaintiffs may bring their claims immediately after they have accrued, the Prison Litigation Reform Act requires a prisoner to exhaust available administrative remedies as a mandatory prerequisite to filing suit:

> No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001) ("Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures."); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *Burton v. Jones*, 321 F.3d 569, 574 (6th Cir 2003) ("[a] prisoner must administratively exhaust his or her claim as to each defendant associated with the claim."). This "assures, as envisioned under the PLRA, that the prison administrative system has a chance to deal with claims against prison personnel before those complaints reach federal court." *Curry v. Scott*, 249 F.3d 493, 505 (6th Cir. 2001).

Cuco appears to argue that because the Prison Litigation Reform Act prevented her from bringing an action until her administrative remedies were exhausted, her claims did not "accrue" until she completed the BOP's grievance process on September 20, 2004. However, the requirement that a prisoner must first exhaust administrative remedies prior to bringing suit does not prevent a

46

claim from accruing; rather, the existence of that requirement acts to equitably toll the running of the statute of limitations while the prisoner invokes and completes that administrative remedy process. As this Court has recently held:

> In his motion, Charlton asserts that the statute of limitations does not begin to run until he has exhausted his administrative remedies, and thus his complaint was timely filed. That is not the law: exhaustion of administrative remedies tolls the running of the statute of limitations, but it does not delay its commencement. *See, e.g., Morales v. City of Los Angeles*, 214 F.3d 1151, 1153-54 (9th Cir. 2000) ("The plaintiffs argue . . . that they didn't know that they truly had lost their case until they had exhausted their appeals . . . . The possibility that a subsequent appellate reversal of the judgments might moot the cause of action does not affect the analysis. Accrual and mootness principles operate independently of each other.").

*Charlton v. Touma*, 06-42-HRW, Eastern District of Kentucky [Record No. 7 at pgs. 1-2]; *see also Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000).

The BOP grievance process is set forth at 28 C.F.R. §§542.10-.19. Before filing a formal grievance, the prisoner must give the prison staff the chance to correct the problem themselves by presenting his complaint informally by submitting a Form BP 8½. 28 C.F.R. §542.13(a). If this fails to resolve the issue, the prisoner initiates the formal grievance process by filing a Form BP-9, a formal written request to the Warden, within twenty (20) days of the event grieved. 28 C.F.R. §542.14(a). The Warden must decide the grievance within twenty (20) calendar days. 28 C.F.R. §542.18. If the Warden does not grant the prisoner the relief he requests, the prisoner may appeal by filing a Form BP-10 with the Regional Director within twenty (20) days of the Warden's denial. 28 C.F.R. §542.15(a). The Regional Director must decide the appeal within thirty (30) calendar days. 28 C.F.R. §542.18. If the Regional Director does not grant the prisoner the relief he requests, the prisoner may appeal by filing a Form BP-11 with the Office of General Counsel within thirty (30) days of the Regional Director's denial. 28 C.F.R. §542.15(a). The Office of General Counsel must

47

decide the appeal within forty (40) calendar days. 28 C.F.R. §542.18. If the BOP decides at any level that the time allowed for it to respond to the grievance or appeal is not sufficient for it to make an appropriate decision, it may give itself an extension of time to respond once at each level--by twenty (20) days at the institution level, thirty (30) days at the Regional Office level, and twenty (20) days at the Office of General Counsel level. 28 C.F.R. §542.18. If the BOP rejects a grievance or appeal at any level and does not give the prisoner the opportunity to correct the defect, the prisoner may immediately appeal the rejection to the next appellate level. 28 C.F.R. §542.17(c). If the prisoner does not receive a response from the BOP within the time allowed (including any extensions), the prisoner may consider the absence of a response to be a denial at that level. 28 C.F.R. §542.18.

Based on the foregoing regulations, absent any unreasonable delay or extension, the BOP grievance process should ordinarily take no more than 140 days to complete after the prisoner commences the formal grievance process. In the present case, Cuco filed her BP-9 on April 28, 2004, and received a final denial from the Office of General Counsel on September 20, 2004, a period of 145 days. Defendants' Motion, Ex. B, pg. 13; Ex. E, pg. 1. The one-year statute of limitations "reaches back" 365 days from the date Cuco's Complaint was filed on June 6, 2005, to reach conduct occurring on or after June 6, 2004. If the 145 days required to complete the BOP grievance process are "tacked on" to this period, Cuco's Complaint will "reach back" an additional 145 days from June 6, 2004, to conduct occurring on or before January 12, 2004.[8]

---

[8] The Court's calculations regarding the statute of limitations account for the fact that 2004 was a "leap" year and the reach-back period straddles the month of February.

48

However, Cuco's failure to file a proper Form BP-10 on two occasions significantly delayed the completion of the grievance process. Cuco timely filed her Form BP-10 on May 27, 2004, but it was rejected the same day by the BOP. Such rejections are usually caused by the prisoner's failure to comply with a simple form or procedural rule, such as using the proper form. Instead of curing the defect promptly, Cuco waited 14 days, until June 10, 2004, to re-file her Form BP-10. The BOP again rejected her Form BP-10 the same day. Cuco once again failed to remedy the defect promptly, this time waiting 26 days before re-filing her Form BP-10 on July 6, 2004. This form apparently complied with the BOP's requirements, as the BOP considered her appeal on the merits.[9] The Court concludes that taking forty (40) days to file a Form BP-10 in proper form is a delay attributable to Cuco that is unreasonable as a matter of law. Because the tolling of the limitations period afforded to litigants while they exhaust administrative remedies is an equitable remedy, it requires diligence in the pursuit of those remedies. *Miller v. Collins*, 305 F.3d 491, 495-96 (6th Cir. 2002); *Irwin v. Dept. of Veterans' Affairs*, 498 U.S. 89, 96 (1990) ("[w]e have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period ...[but we] have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights."). The Court will therefore exercise its discretion and determine that Cuco should have been able to correct any

---

[9] 28 C.F.R. §540.17(c) permits a prisoner to treat a rejection as a denial and immediately appeal to the next level if the BOP both rejects the grievance form and denies the prisoner the opportunity to correct the deficiency. Only the fact of the BOP's rejection of Cuco's Form BP-10 is in the record, not the notices of rejection themselves. The Court is therefore unable to determine whether the BOP afforded Cuco the opportunity to correct any defects, and hence whether Cuco could have availed herself of this provision to expedite the grievance process. However, the fact that Cuco was permitted to file a second FormBP-10 and that the BOP considered her third Form BP-10 appeal on the merits is a strong indication that the BOP's rejection notices indicated to Cuco that she could correct the deficiencies and file a corrected Form BP-10.

mistakes and file an amended Form BP-10 that complied with the BOP's requirements in a matter of no more than ten days, not forty. The Court will therefore reduce the tolling period by thirty days, the difference between the forty days actually taken by Cuco to rectify the error and the ten days it should have taken. The resulting period of equitable tolling is thus 115 days and "reaches back" from June 6, 2004 to February 11, 2004. Based on the foregoing calculations, Cuco's Complaint reaches claims that accrued on or after February 11, 2004.[10]

### 4. The Subject Matter of Cuco's "Deliberate Indifference" Claims.

To facilitate the determination of when each of Cuco's claims "accrued" for statute of limitations purposes, each aspect of Cuco's medical treatment about which she complains in her Complaint, Response, and Affidavit will be addressed separately.

### (a). Inappropriate Treatment of Anemia.

Cuco's primary complaint in this proceeding is that during her stay at FMC-Lexington her severe anemia was treated with oral iron supplements instead of intravenous iron, causing her to suffer from excessive bleeding and resultant dizziness, severe gastric distress, and an exacerbated fibroid condition. Cuco informed the medical staff at FMC-Lexington that she was allergic or non-responsive to oral iron supplements on November 13, 2003, but they continued to treat her anemia with oral iron supplements instead of other alternative therapeutic options. Thereafter, Cuco complained frequently about the resulting gastric upset, as evidenced by examination notes dated

---

[10] In certain circumstances, the pendency of a lawsuit raising a plaintiff's claims will toll the running of the statute of limitations where it is subsequently dismissed without prejudice for failure to satisfy procedural prerequisites, such as exhausting administrative remedies. This was the case with Cuco's prior lawsuit. *Cuco v. Booker*, Civil Action No. 04-218 [Record Nos. 1, 3 therein]. However, Cuco filed that lawsuit on May 14, 2004, after she had already initiated the BOP grievance process on April 28, 2004. Therefore, the pendency of that suit does not act to toll the statute of limitations further under these facts.

December 5 and 18, 2003; January 5 and 16, 2004; March 9, 2004; April 5, 12, 20, and 29, 2004; May 3, 2004; June 1 and 18, 2004; and July 12 and 30, 2004.

The foregoing dates indicate that Cuco specifically requested intravenous iron supplementation, that request was denied, and she was suffering pain and discomfort as early as December 5, 2003. Such facts clearly put Cuco on inquiry notice of her claim, and thus her cause of action related to this treatment can be said to have accrued by this date. *Collard*, 896 F.2d at 183; *Friedman*, 929 F.2d at 1159. As this date is earlier than the February 11, 2004 cut-off date, this claim falls outside the limitations period and is therefore time-barred unless other factors intervene to preclude this result.

In this regard, the Court notes that the Defendants' treatment of Cuco's anemia was not a one-time event, nor were her complaints about its appropriateness: they occurred throughout the duration of Cuco's ten-month incarceration at FMC. Cuco has not specifically raised the issue, but as the Court is addressing the issue of claim accrual as part of its analysis of the Defendants' statute of limitations defense, the Court must consider whether it would be appropriate to apply the "continuing violations" doctrine under the facts presented here. *Cox v. City of Memphis*, 230 F.3d 199, 202 n.4 (6th Cir. 2000) (continuing violations doctrine may apply to civil rights claims as part of the federal common law of claims accrual).

Claims like those asserted by Cuco, which challenge the appropriateness of medical care provided over an extended period of time to treat a chronic medical condition, as opposed to treatment for a discrete injury, may be peculiarly appropriate for application of the doctrine:

> The district court, as we said, thought the date of accrual was when the plaintiff discovered he had a medical problem that required attention. This would be correct if the suit were for medical malpractice. ... But it is not; malpractice does not violate

51

> the Eighth Amendment; instead the suit charges that the defendants inflicted cruel and unusual punishment on the plaintiff by refusing to treat his condition. This refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail. Every day that they prolonged his agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew. A series of wrongful acts creates a series of claims.

*Heard v. Sheahan,* 253 F.3d 316, 318 (7th Cir. 2001) (applying continuing violations doctrine to Eighth Amendment deliberate indifference claims). The continuing violations doctrine permits a court to look backwards to the entirety of an ongoing wrong to assess its cumulative effect, so long as at least one concrete injury falls within the statute of limitations period. *Heard,* 253 F.3d at 318; *Tiberi v. Cigna Group,* 89 F.3d 1423, 1430-31 (10th Cir. 1996) ("the statute of limitations does not begin to run until the wrong is over and done with.").

The continuing violations (or "continuing acts") doctrine was first developed in the context of employment discrimination claims, and the Sixth Circuit has approved its use in two factual scenarios:

> The first category arises where there is some evidence of present discriminatory activity giving rise to a claim of continuing violation such as where an employer continues to presently imposes [sic] disparate work assignments or gives unequal pay for equal work ... The second category of continuing violation arises where there has occurred a long-standing and demonstrable policy of discrimination. This requires a showing by a preponderance of the evidence that some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure.

*Burzynski v. Cohen,* 264 F.3d 611, 618 (6th Cir. 2001) (internal quotations and citations omitted). These two categories offer little guidance when determining whether the facts justify the application of the doctrine outside the context of employment discrimination claims. In the context of a deliberate indifference claim, the *Heard* court considered three scenarios, only one of which justified

52

application of the doctrine. The doctrine does not apply where a single, discrete event causes ongoing injuries, such as where an inmate breaks his leg during a fall and the prison fails to properly treat the injury over an extended period. *See, e.g., Hill v. Godinez*, 955 F.Supp. 945 ( N.D.Ill. 1997) (failure to perform surgery on broken nose beyond 7-8 day period recommended by another doctor does not constitute continuing course of treatment that delays running of statute of limitations). Nor does the doctrine apply where a series of events causes discrete injuries, as where a prison's failure to provide an injured inmate with a wheelchair instead of crutches causes him to fall on a number of occasions. *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003). Rather, the doctrine may apply where a continuous series of related events gives rise to a single, cumulative injury, as where a prison fails to adhere to dietary restrictions for a diabetic resulting in a permanent exacerbation in his condition. *Heard*, 253 F.3d at 320. But even where, as here, this factual scenario is present, a court must further determine whether the policy considerations which justify application of the doctrine are present as well.

The Sixth Circuit generally disapproves of applying the doctrine in civil rights actions. *Sharpe*, 319 F.3d at 267 ("This Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to §1983 actions.") (applying the Supreme Court's restrictive application of the doctrine in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-12 (2002) to civil rights claims pursued under Section 1983); *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1106 n.3 (6th Cir.1995). This may be due, in part, to the fact that considerations which justify the application of the continuing violations doctrine in race and sex discrimination cases are often absent outside of that context. In *Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220 (6th Cir. 1991), the Sixth Circuit explained that the doctrine developed because of the concern "that

53

many discriminatory acts occur in such a manner that it is difficult to define precisely when they took place." The facts which, only over time, make it clear to a plaintiff that he or she is or may be the victim of race or sex discrimination tend to "unfold rather than occur." *Bell*, 929 F.2d at 223. Thus, by the time a plaintiff discovers that adverse employment decisions may have been the result of a discriminatory work environment, many of the initial acts of discrimination may fall outside the limitations period. The continuing violations doctrine may thus be considered a rule designed to ameliorate the harsh consequences of a strict application of the discovery rule under the statute of limitations. *Id.*; *Barcume*, 819 F.Supp. at 636.[11]

In the present case, the Court concludes that application of the doctrine of continuing violations would not be appropriate. First, the Sixth Circuit held in *Sharpe* that the first category of continuing violations, the one upon which Cuco would have to rely to keep this claim within the limitations period, was rejected by the Supreme Court in *Morgan*:

> *Morgan* overturns prior Sixth Circuit law addressing serial violations, *i.e.*, plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period. The second category of continuing violations, involving a longstanding and demonstrable policy

---

[11] In contrast to this rationale, the Seventh Circuit in *Heard* justified the continuing violations doctrine as a pragmatic rule to require the presentment of factually-related claims in a single judicial proceeding:

> But what exactly is a "continuing violation"? A violation is called "continuing," ... when it would be unreasonable to require or even permit [a plaintiff] to sue separately over every incident of the defendant's unlawful conduct. ... every day that the defendants ignored the plaintiff's request for treatment increased his pain. Not only would it be unreasonable to require him, as a condition of preserving his right to have a full two years to sue in respect of the last day on which his request was ignored, to bring separate suits two years after each of the earlier days of deliberate indifference; but it would impose an unreasonable burden on the courts to entertain an indefinite number of suits and apportion damages among them.

*Heard*, 253 F.3d at 319-20.

of discrimination, is not implicated by *Morgan.*

*Sharpe,* 319 F.3d at 269.

Second, even if Cuco's claim could be considered to fall within the second category of the continuing violations doctrine, the policy justification noted above for utilizing the theory simply does not apply under these facts. The facts in this case do not indicate that Defendants' determination to treat Cuco's severe anemia with oral iron supplements rather than with intravenous iron is one that "unfold[ed] rather than occur[red]." *Bell,* 929 F.2d at 223. The Defendants determined to treat her anemia with oral iron immediately upon her arrival at FMC and simply adhered to this treatment regimen throughout Cuco's stay at the prison.

Finally, if the second category of the continuing violations doctrine were applied, it would not assist Cuco. Even if Cuco's awareness of the BOP's determination to treat her anemia in this fashion might still be said to have been "unfolding" to her in the time period immediately after her arrival in November 2003, the Defendants continued to adhere to this treatment regimen throughout December 2003 and January 2004, notwithstanding Cuco's repeated complaints of the discomfort it was causing her. This establishes that the conduct complained of, Defendants' decision to treat her anemia with oral iron, had definitively "occurred" not later than late December to early January. By February 11, 2004, the date that the Court has also concluded is the farthest Cuco may "reach back" for statute of limitations purposes after extension for equitable tolling, Cuco was no longer suffering from "continuing violations" of her Eighth Amendment rights, but rather was merely experiencing the "continuing effects" of the Defendants' initial treatment decision. *Cf. Lovett v. Ray,* 327 F.3d 1181, 1183 (11th Cir. 2003); *Paschal v. Flagstar Bank,* 295 F.3d 565, 572-73 (6th Cir. 2002); *Tolbert v. State of Ohio Dep't of Transp.,* 172 F.3d 934, 940 (6th Cir. 1999). Cuco's *Bivens*

claim arising out of the treatment of her anemia must therefore be dismissed.[12]

### (b). Delay in Initial Medical Consultation.

In her Complaint and Response, Cuco also alleges that despite her request to see medical staff immediately upon her arrival at FMC, she was not seen by medical staff until three days later. However, Cuco's Medical Records indicate that Cuco was examined and evaluated by FMC medical staff on November 13, 2003. The factual discrepancy is irrelevant: this discrete event occurred well before the February 11, 2004 reach-back period, and is therefore barred by the statute of limitations. *Friedman*, 929 F.2d at 1159; *Barcume*, 819 F.Supp. at 635.

### (c). Refusal to Provide Consultation with Psychiatrist.

Cuco alleges that upon her arrival on November 13, 2003, she demanded that she be seen immediately by a psychiatrist so that she could be prescribed medications for her psychological conditions, but that this request was not honored. As with claims regarding her treatment regime for anemia, it should have been clear to Cuco no later than late December 2003 to early January 2004 that this request would not be honored, and her claim based upon this refusal is therefore time-barred as falling outside the limitations period. *Collard*, 896 F.2d at 183; *Dixon*, 928 F.2d at 215.

### (d). False Diagnosis and Treatment for Tuberculosis.

Cuco alleges that upon her arrival at FMC-Lexington she was given a test for tuberculosis ("TB") and, when the results came back positive, was put on medication for TB which caused her

---

[12] The Court also notes that because the continuing violations doctrine is inherently designed to address systemic, policy-based discrimination or injury, its application to civil rights claims under Section 1983 would only be appropriate against those in a position to create and perpetuate the systemic violation, either the institution itself or those with substantial supervisory authority, and not individual capacity claims against federal actors not in a position to create or perpetuate such a policy, at least in the absence of a claim of a conspiracy to interfere with her civil rights pursuant to 42 U.S.C. §1985.

severe liver pain. Cuco alleges that thereafter Dr. Growse questioned the necessity of the TB medication, indicated it could injure her, and canceled the prescription. Cuco indicates her belief that the false positive result may have been caused when she scratched the test site. Cuco Response at pg. 12; Cuco Affidavit at pg. 12. Cuco asserts her belief that this treatment for TB may have caused her permanent liver damage. Cuco has not directed the Court to a date when she was either treated for TB or when that medication was discontinued.[13] Based on the present state of the record, the Court is unable to make a determination whether this claim is time-barred.

(e). <u>Delay in Testing and Diagnosis of Possible Breast Cancer</u>.

Cuco appears to allege that Defendants were deliberately indifferent to a risk of breast cancer through unreasonable delay in assessing and testing her for the condition. In December 2003, Cuco complained of breast pain and discharge to Defendant Durbin. After she formally requested a mammogram on January 15, 2004, she was given a mammogram on February 12, 2004, after she missed her first appointment for one on February 4, 2004. She was also given a breast ultrasound on July 30, 2004. The Court concludes that, based on the record before it, Cuco's claim, if any exists, regarding delay in treatment for her concerns about breast cancer, would not have accrued until some time after her mammogram was taken and its results assessed. As these events must have

---

[13] The Court's own review of Cuco's Medical Records reveals a handwritten examination note dated February 17, 2004, which appears to be in Dr. Growse's handwriting, and which appears to state: *"D/C INH"* Cuco Medical Records at BOP0032. "D/C" is seen throughout Cuco's medical records, and when viewed in context and compared with the declarations of the FMC medical staff, appears to be a shorthand notation indicating a medication is "discontinued." "INH" is an acronym commonly used to refer to isoniazid, a class of drug sold under the trade names Laniazid and Nydrazid, and which is one of many medications used to treat tuberculosis. The notation immediately below that, although the handwriting is barely legible, appears to read "D/C Pyrazine," meaning the discontinuation of Pyrazine, the trade name for pyrazinmide, another medication used to treat TB. It appears tuberculosis is often treated with a "cocktail" of medications. Although not conclusive, it appears Cuco's claim in this regard may have accrued no later than February 17, 2004, which is within the limitations reach-back period.